and Glynn. May it please the court, Jonathan Moore, along with my colleague, Luna Druby, on behalf of the appellant, Cherise Wells, I would note for the court that she's in court today attending this hearing. Judge, a tragic event occurred on January 24th, 2012, Robert Chambers was a 19 year old African-American male who was shot in the back of the head as he was moving away from a police officer, Stephen Glynn, and it's undisputed that he was unarmed at the time and we believe, and it's undisputed, no warning was given to Mr. Wells at the time to stop, to not run away. It's undisputed he was unarmed at the time? Yes, it's undisputed that it's, in fact, the court, the district court, in its opinion, uses those terms. It's undisputed. It depends on what you mean by at the time. Exactly. The officer's testimony or position is that the decedent, when he was wrestling with him, was armed, tried to get his gun, pull the jacket, coat, whatever off, and the gun was no longer there where it had been and he assumed that the decedent, the plaintiff, he assumed that Mr. Chambers had the gun with him because it was no longer where it had been when they were wrestling and tussling. So it's not undisputed that the officer knew he was not armed. Right. It's not undisputed that the officer didn't have a reason to reasonably believe that he was armed. I actually think, Judge, that the record is more favorable to the appellant. If you look at four times in Officer Glidden's deposition, he was asked as he, right before he shot, did you see a gun? Four times he said no. He said, no, sir, I did not. No, sir. Yeah, but you didn't say it's undisputed that Glidden didn't see a gun. What you said was it was undisputed that he wasn't armed. It's now undisputed that he wasn't harmed, but at the time the shot was fired, I don't see how you can say there was no reasonable basis for the officer to have mistakenly believed that he was armed. I would say that this exchange illustrates why there's a genuine dispute of material fact about whether he was armed. We believe the circumstances, the facts of this case, would, to a reasonable jury, appear that at the time he was shot, Mr. Chambers was, in fact, unarmed. Based on the evidence that was before the district court at the time hit rule on the summary judgment motion. Yes, based on that evidence. We think even before we got involved in the case and supplemented the record, but yes, I would say even based at that time, if you look at the video evidence and if you look at Officer Glidden's statement, Officer Glidden says in his initial police report, he says as the suspect got up and attempted to flee the scene, he started to run toward the residential neighborhood with the gun still in his possession, yet four times in his deposition, he says he didn't see a gun. I think that's important. That's an important contradiction and consistent testimony by Officer Glidden, but more importantly, I think you have to look at what happened here, not just in terms of one isolated incident, one isolated fact. You have to look at the totality of the circumstances. This court's fully familiar with all the qualified immunity cases. It's bedeviled this court and many courts for many years. It's clear that there were some significant factual disputes in this case at the time the judge decided summary judgment and certainly even after we supplemented the record. It seems to me like if you, that your strongest argument might be, assuming that there's a way to that the gun was planted, that the gun was never actually there at the scene, the stolen gun, I'm talking about. And maybe, you know, maybe the fact that the computer, the laptop was never recovered also raises that question. Maybe the fact that when we look at the photographs, the initial ones don't seem to have too many leaves on them and the later ones by timestamp do, all of these things do seem to me to be suspicious. But one of the, but there's the initial question of why wasn't this information brought in the first time? Because now we have to consider it on an abuse of discretion standard. So I don't know if you want to address that. I think that's a fair question, Judge. And I think that the district court permitted us to supplement the record. And even though it was, you know, we were not involved initially in the case. He didn't permit you to supplement the record for a de novo reconsideration of summary judgment. He permitted you to do that on your 59E and 60B, various 60B subsections, motions, so he could see what you were offering. And then revisited the summary judgment and then revisited his decision and affirmed his decision. But he did allow us to, he did consider the additional evidence. In fact, he said, considering it would not be any prejudice to the defendant, he says that in his decision, his subsequent decision, we have a situation here, Judge, where you have only one account that survives. There are no other witnesses to what happened. Robert Chambers can't get up here and speak for himself. The only, it's similar to the case that was decided after our briefing on the Adams case where this court denied a claim of qualified immunity on very similar facts. But Robert Chambers can't speak for himself. So we have to, and the court had an obligation under these circumstances, and the judges have talked about this, to make a critical assessment of all the facts, given the serious nature of the injury, given that an officer has taken somebody's life by shooting him in the head to consider all these facts. I agree with you, Judge Rosenbaum, that those additional facts raise real questions about this investigation. But even before you get to those facts, there are several significant facts which I think the court overlooked or didn't take into consideration. Let me ask you, let me ask you this, because as I read the district court's opinion, this is what he found to me that's critical. He says the district court found that Deputy Glidden was entitled to qualified immunity because he reasonably believed, not that he knew, not that he saw, that he reasonably believed that the deceased was armed and posed a threat of serious physical harm to the other officers in the area or residents in the area. What is wrong with that? Well, of course, the question of whether it was a reasonable belief is a question of fact, which which has to be decided only after consideration of all the facts. We believe the district court, as I was about ready to say, disregarded several significant facts. If you look at the video from the Taser, I looked at I really couldn't tell much from that. Well, you can tell some significant things. One is you see a compliant Robert Chambers saying I'm on the ground, I'm on the ground. And no one does he say I'm on the ground. To give you an example of how compliant he says I'm on the ground, sir. Does that sound like he wasn't shot at the time? He said, I'm on the ground, sir. That's right. That's the problem with your interpretation of the video. Somebody can be compliant one second and noncompliant the next. I have no doubt that he he he then tried to leave the scene. We don't exactly know. And you have no doubt that's not being compliant. So the fact that the video proves he was compliant, it doesn't prove he was compliant at the critical time. Well, it proves at a very at maybe not the most critical, but at a critical occurrence in this event, this series of events that he was being compliant. Let me ask you a question about that, because I did think I saw two shadows running in that video. It's very hard to see, but it does appear that there are two shadows that run. And it does also appear from the record that, well, actually, Officer Glidden says several times he shot from a kneeling position that he didn't chase him, et cetera. So but then that raises the issue of what is the significance if it turns out that he did chase him? What is the significance to the ultimate finding that the district court made that Judge Dabena referred to? You always have to consider the credibility of the officer's testimony, particularly. Right. But I guess my question is, does it in any way affect the reasonableness of his decision to chase and then shoot? I mean, as opposed to if he's on the ground and he shoots, is there other than credibility? Was it so? Well, I don't know whether it does. That's what I'm asking you. I understand that it may go to the credibility issue, but that's a separate, you know, that's a separate issue. But the question is, does it also somehow affect the ultimate finding of the district court? Does it make the shooting less reasonable? Well, it's reasonable that he would have had time to give a warning, time to say something to him. Stop. Stop. Don't go. You know, you know, whatever. There was there's no I'm going to shoot. Right. There's no evidence that he was that that that that there was any suggestion that the that he gave a warning. I thought the officer admitted he did not give a warning. Yes. Yes. Right. So all a lot of those factors that the courts have looked at, the absence of a warning. The question of whether one of the real questions, if I may just I know I've extended just if I may just finish this one point. Which just goes to your question, whether even if we accept that Officer Glidden has not testified truthfully about where he shot him, because let's face it, it would have been impossible for him to shoot him in the left side of his head. If you look at the exhibit in that he's going around the corner. Right. It'd have to be like a matrix. I don't know. Anyway, it would have been impossible for him to do that. The question becomes, however, whether in these circumstances, even if even if. Robert Chambers had that gun somewhere in his possession, clearly he wasn't in his hands because Glidden didn't see it in his hands, but let's assume he stuck it in his waistband or or somewhere in his in his clothes, even under those circumstances, we would suggest we would submit to you that the prior case law in this circuit. Adams and the cases cited in Adams would would would not hold that it was reasonable for a police officer under those circumstances to use deadly force to shoot Robert Chambers as he's running away, because if you accept that proposition, any officer who then might have got a radio report that Chambers is running away, we think his arm could have been shot on site. And that's certainly not. No, what you leave out, of course, is that he was armed at the time. And according to the police officer's account, according to his office, I know. But you have to have evidence contradicting he tried to get the firearm out of his pocket or coat pocket and officer struggle with him. And then he attempted to get the officer's weapon out of his holster. And then he took off running, and if the officer could reasonably believe that he had that weapon on him, then you'll have a hard time, I think, at least convincing me that that exercise of deadly force was not for was was a violation of the. I think I would challenge your conclusion, judge, that that that it's established without any dispute, any genuine dispute that he was armed at the time. He does not appear on this appears to be nothing in his hands as he's going on the ground, as he's on the ground with a video. His demeanor does not suggest the demeanor of somebody who's who, according to Officer Glidden, has just tried to was threatening to kill him by pulling a gun out. We only have Officer Glidden's word, and so that's why his credibility obviously is key. And that's why this it was, I believe, and I understand, Judge Carnes, your view of the evidence. I don't think it was appropriate for a district court judge to make that determination under these set of circumstances that it should have been decided by a jury. OK, counsel, you've got three minutes in reply. We'll hear from Mr. Williams now. Good morning, your honors. May it please the court. I'm Terry Williams. I represent Deputy Steve Glidden in this matter. The court has honed in on the issue, and that is whether the district court properly found that Deputy Glidden's use of deadly force was objectively reasonable under the circumstances as presented to him as a reasonable officer. And the court got it right. Let me tell you, I do have some serious concerns about this case. Based on the evidence that was submitted the second time around, I think there might be a material issue of fact about whether something some kind of evidence planting went on. I don't understand why, if they found the gun that was stolen from the house, they would not have also found the laptop. What else could he have done with it? And I don't understand why, when you look at the photographs, which are in a sequence, the first one has about two or three leaves on it. And most of the gun is visible. And the later ones, including some that are taken, there are some taken 20 minutes later. But then those are all within a minute of each other. And they have varying degrees of leaves. And in one of them, it's practically buried completely. And that just seems awfully strange to me. I don't I don't understand that. Your Honor, here's the problem with this evidence that they've attempted to bring in after the fact. There's been there was no discovery. There was no fleshing out of these things that they've now tried to make issues out of. So the district court did not abuse its discretion in denying the Rule 59 and Rule 60 motions in that regard. Beyond that, we tried to go. I'm sorry. What do you mean there's no fleshing out? It seems to me that their argument was that when you look at these things, there's at least a material issue of fact as to whether the officer was telling the truth. That is, the officer claimed that he saw a gun or at least what he thought was the butt of a gun. And then all of a sudden, if if there was no gun that was actually there and the gun was planted, that seems to me to cast some serious doubt on the officer's story. And then you add to that the fact that in the video, when you watch the video, the officer says right before the shot, I'm not going to tell you again. And then you hear the shot and you have her footsteps running. He's clearly running away from him. And as that's true, he is pointing out he's not complying at that point. Let me address. He's running away from him. But you also see in the video what appear to be two different shadows. And also, if you look at the map, it looks like where the taser thing happened and the jacket came off is several feet from the right turn that Mr. Chambers made when he ran off. And there are several trees and bushes in the way. And yet, even though Mr. Chambers makes a right turn, somehow he's shot in the back of the head on the left side, which seems like a physical impossibility if there was no chase that occurred. And so when you put together all of these things, it seems to me to at least raise a material issue of fact. For me, the concern is whether or not, you know, because we have to look at it as an on an abuse of discretion standard, whether that is going to be sufficient to overcome that. But maybe you have an answer as to why that doesn't why I shouldn't even be concerned about it in the first place. And it doesn't raise a material issue of fact, because it seems to me to do so. Because all of the things they point out are specious arguments based on this evidence, and I can address each one of them. First of all, you noted the shadows running in the in the images of the taser. Well, first of all, you have to remember, and I have a picture of this blown up. This is a still photograph taken from the video that they attached to their. This was not in the record at the time. The district. I looked at the stills and I will tell you that I will tell you that you can't see anything from the stills. Where you get it from is the orientation of the camera, your honor. And this was clear this up. The taser was laying on its side when it fell. And that's proven by the other photograph they produced. So when the tasers land on its side, it's taking images from its side. OK, so when then it's played, the image becomes reversed and you can see the play and push buttons down here at the bottom. So the shadows that they're saying are running from left to right are going from sky to ground. So it does not show anybody going left or right. That's a physical impossibility when you look at the orientation of the of the. The camera, which is why I say these things are spacious and fleshed out. How do you explain how he shot on the left side of the head when he makes a right of the head, your honor? I understand. But when he makes a right turn and your client says that he shot him from a kneeling position where the struggle occurred, which appears to me at least to be, you know, several feet before the right turn is made. It seems as a matter of physics like he would have been shot on the right side or in the back on the right side and not the left. Well, it depends on how his head was turned. I mean, all these things are just speculations because, again, they weren't fleshed out during the discovery part of the case or during the motion for summary judgment was pending. But your honor, the tree does not block. This is where the taser is located. The tree does not block the view. They make that up in their argument that it was blocking it. There's no photograph showing any foliage from that direction. All we have is a diagram. And even in the diagram, the tree does not block the line of sight that Deputy Blinton would have had. That's a specious argument that on its face, you think, well, there's something there. But you look at it closely. It's not. But even so, unless his head was turned, I mean, if his head were turned, then you might be right. But unless his head is turned, I don't see how he could have shot him on the left side of the back of the head. And in the autopsy report, which they didn't introduce, it shows that it was only an inch and a half from the midline of the skull. So that could very easily happen if the bullets travel a little left of the middle of the back of the head from the angle. That doesn't disprove that Deputy Glidden was in the position where he testified he was. They have absolutely no credible evidence. All of which feeds into your argument that 55 exhibits should not be dumped on the district court at the post judgment stage, but should have been brought up in the summary judgment stage. So there could be response to them and counter exhibits introduced, such as an affidavit about the taser camera and also the autopsy report and so forth. Because the district court found as an alternative ground, did it not, that the law of the circuit was all the evidence was available to plaintiff prior to final judgment. Arguments could have been raised in the plaintiff's response to defendant's motion for summary judgment. Cite, cite, cite. Yes, Your Honor. They didn't even attempt to show that this wasn't available. They had all of this information. It's all in the GBI investigative file materials. It was all produced of them. Even before the litigation, it was obtained in open records requests. They had all of this. And yes, we didn't get the opportunity to show that all these things that are breaking up are, can be easily explained, such as the time stamp on the photographs. The photographs with the leaves on top of it were taken before the GBI photographs because our guys were the first ones there. The investigator that was called in, he secured it and took the photographs. Once they found the weapon that had fallen out, apparently in the altercation, he cleaned some leaves off and marked it because the camera was not, when I found, when they raised this for the first time afterwards, I talked to Detective Pennycuff and he said, well, I didn't pay attention to those cameras, SLRs. You have to set the time. They're not automatically updated like cell phone cameras. This is a camera that you set. OK, but unless somebody actually set it between when they took the first ones and when they took the second ones. I'm off the top of my head. I feel like it was 10 o'clock and then 1020 or 1026 or something like that. That's correct. Right. OK, so then what would have had to have happened, if you're right, is that the ones that appear to be the later ones, the 1026 ones were taken first and then somebody reset the clock, which is how you get to 10. No. How is that? The other photographs were taken by the GBI. So that's why the GBI took photographs after the leaves were taken off, because they arrived after the same two different cameras. Oh, yes. Oh, yes. OK, so they're trying to suggest they were both the same. I have to go back and double check. But there's also a sequential number in addition to the timestamp. So I don't remember now off the top of my head whether it appears that they're all from the same time sequence or from the same, you know, sequential number. The ones taken from Detective Pinnacuff's camera have that there are several of those and those have the timestamps. So you're saying that the other one would not. Yeah, it was taken by the GBI. So they had different internal the clocks weren't synchronized. So that easily explains it. But we never got the opportunity because they brought all this up after the fact. Just like they didn't bring in the autopsy report because, well, it's not favorable because it shows a number of other things. They didn't bring in more investigating materials because it showed that Chambers had more items from the burglarized house in his possession. Yeah. Did he have the computer? Did he get somewhere? Apparently so. He'd been wandering around in the woods for some period of time since he ran out the back of the house. So you're talking about the telephone. You're talking about the phone. I got TV remote was discovered that he had taken from the house. There was like a computer flash drive that was taken. There was a ski mask that was around his neck that apparently he had had on at one point that would cover his face. There's a bunch of other things. But previous counsel didn't go that way because it was pretty much he couldn't dispute that he was the burglar. They were focused on, well, was the shooting reasonable even given those things? What is your understood? What is your response to their argument that the gun was not stolen in the burglary? Another thing that was never flagged, the serial numbers were matched up. There's documentation that again, there was not a dispute about that before summary judgment. Did the home owner who burglarized say, that's my gun? How do you know the serial numbers? I know Detective Pinnacuff testified about that. They matched up the serial numbers. Now, what they try to do after the fact is to suggest because the manufacturer may have referred to this weapon as blue steel, that it was a different color than the black weapon that the homeowner described, which Deputy Glidden also described as black. And we believe most people would describe this weapon as being black if you see it. Here's a color photograph from a distance. You would think that that is black, not what they call blue steel. But there's no dispute, excuse me, there's no evidence reasonably placing in dispute that the serial numbers match. No, there's no evidence placed in the record that they, well, no, Deputy Pinnacuff testified to that in his deposition, I believe. But the actual documentation of that was not placed in the record. But that exists, just like they brought up the lack of fingerprint analysis. Well, that wasn't fleshed out. We could actually prove, if we needed to, that that was done, but it was not contested at the time. So, we didn't even see a need. You looked for fingerprints, but as is typical, there were no fingerprints on the gun, right? Whose fingerprints were on the gun? That wasn't tested, but Chambers' fingerprints were found at the scene of the burglary. So, we never contested that because they never contested that. They didn't match the gun because there was no dispute that he had had the gun. I mean, it was laying right there, and it's a, the astronomical coincidence that they would have to argue for this being planted is it was the same manufacturer, it's the same model, PT-145, same caliber, same description, only difference is the manufacturer calls it blue steel. So, they come up with this wild theory that it was planted somehow, that they just happened to have such a gun that the homeowner lost with them available to put there at the scene. It's ludicrous. It makes no sense, and it certainly does not represent abuse of discretion for the district court to deny that in the context of the Rule 59 and Rule 60 motions. The evidence should be very clear and convincing for there to be abuse of discretion, and this evidence is specious, and when you look at it closely, it doesn't say, it doesn't prove what they are contending it does. Just like the video, it took a while because we had not focused on this, but when we kept looking at it, we're like, well, the trees are sideways when you see it. Well, that's because the taser is laying on its side, and its screen always stays oriented to up, down with the gun. So, when you're looking at it, once it's raised up, then everything is sideways, which means those little images they see are going into the ground. We don't know what they are, but they couldn't be running sideways because they'd have to be going from the bottom of the screen up to be running. So, that's another specious argument that they make that falls apart when you examine it. They made other ones about the cell phone not being on the table in the second photograph. Well, what they didn't point out was the second photograph was taken from a different angle that blocked the view of the cell phone. Well, once we pointed that out, they sort of just let that argument go on appeal, but all of these things are of that nature. They're just not accurate, and most importantly, they were not in the record for the district court. Everything that was in the record shows that Deputy Glidden acted reasonably under the circumstances. You're talking about the record at the time of the summary judgment motion? Yes, Your Honor, because he was faced with, in a dangerous, tense situation, he was faced with somebody who had struggled with him, attempted to pull a gun on him, attempted to get his own gun. Even if that brief moment when he's got him down on the ground, he's seemingly compliant. He obviously wasn't because there was the struggle, the taser gets flipped off, and you hear running, and then the shots are fired. It's within split seconds. So, Deputy Glidden had to make a split-second decision under circumstances that were dangerous and tense, and he made a reasonable decision, albeit later it was discovered that he no longer had the weapon. But a mistaken belief is reasonable under those circumstances, and therefore, the district court's decision should be affirmed. Thank you, Your Honor. Mr. Moore, I have a question for you when you're ready, and is it true that the autopsy report shows that the entry wound was roughly an inch off the midpoint of the back of him? We've never seen the autopsy report. As far as I know, it was never produced in discovery at any time in this case. Did you ever ask for it? And by you, I'm talking about previous counsel. No, I mean, I assume they asked for a discovery of all documents related to the case. I mean, I don't know if they asked specifically for it, so I'd have to go back and recognize this, but here is the major, big problem we haven't adequately addressed here. You had a lawyer who came in and tried the case and had strategies and tactics, and he put in the evidence he wanted, he asked for what he wanted, and he lost. Our system can't really function if every time a litigant loses a case, he or she can hire a new lawyer to come in to see if they could do a better job on a Rule 59E. Well, I mean, it just can't. You have 55 exhibits. And let me read you some quotes from 2005, 2007, 2014 decisions of this court. Further, a Rule 59E motion cannot be used simply as a tool to reopen litigation when a party has failed to take advantage of earlier opportunities to make its case. Next, a Rule 59E motion cannot be used to re-litigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment. Finally, a party cannot use a Rule 59E motion to re-litigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment. In every single piece of this evidence, as I understand it, all 55 exhibits could have been obtained and put in at the time of summary judgment. I think I think I think that's true for some of the evidence that has been submitted. I think some of the evidence was before the court and the court didn't. What evidence was not obtainable before summary judgment? I'm not saying it wasn't obtainable. Is there any evidence that could not be obtained? You're missing my point. Is there any evidence in those 59 exhibits, any of those 59 exhibits that could not have been obtained by the previous attorney had he exercised diligence? I would I without I'm not going to say yes or no, because I have to I have to look at all the exhibits. I understand your point. I understand our dilemma here. We were not involved in the case. But the reality is that a young mother lost her son shot in the head by a police officer and he was not armed at the time. I understand that. And if I may judge, if I may, the court always has the power as a court sitting in equity or a court of justice in the United States to do justice, to prevent manifest injustice under Rule 59 and Rule 60. And that's essentially what we have argued here. We understand we can't get up and say this is this was newly discovered evidence because it could have been provided. It might have been made available to the court. We don't know. And certainly a lot of it wasn't before the court when it made the decision. The court had no problem with the supplemental supplementing the record. They allowed it to. Well, the court actually pointed out that the evidence could have been put in earlier and was. No, I mean, I'm not going to get up and say it couldn't have been, but we know you're making it as though the district court said, don't worry, you know, I'll forgive you. That's not what the district court said. What the district court did was it didn't do that. I wouldn't say it did that, but it did say this evidence. I will. I will consider it. I don't think the submission of it prejudices the defendants and then went on to affirm its decision on summary judgment, considering all the evidence. Well, actually, actually, it said when bringing a Rule 59E motion based on new evidence, the movement must show either the evidence is newly discovered or if the evidence was available at the time of the decision, the council made a diligent yet unsuccessful effort to discover the new evidence. Cite, cite, cite and said it didn't do that. Well, right. The previous lawyer didn't do that, but but still under Rule 59, Rule 60 with a manifest injustice standard, we believe this is a case where the court can exercise that discretion. A court of appeals can exercise that discretion to send this back for a fuller for a full and complete litigation with respect to what happened. I would also say, Judge, you know, I heard the word specious over and over and over again. It's not there are he says there's no foliage blocking the view. There are there are other pictures that show foliage blocking the view. We can provide those. We could spend the rest of the day talking about the 55 exhibits and whether they change anything and what he would have put in had they been put in summary judgment. Just so you don't misunderstand me. I know this is a tragedy. I know if you had been in the case, you might have gotten their motion for summary judgment defeated. But we can't. If we could just decide each case on its own without worrying about precedent in the past or precedent, we'd create a feature or whatever the established rule law is by our prior final precedent. Be so easy. You know, it would be so easy. But let me finish. I am deeply concerned that to rule in your favor, we would basically be saying that a litigant, not just in qualified immunity, not just in tragedy cases, but in any case, a litigant who loses can go get a new lawyer and say, can't you give a better run at this? And then they put in, I think, I think that the safety valve in these kind of situations is a malpractice action. And if this lawyer, if the evidence creates an issue and gets you trial and you would have prevailed at trial, but for the lawyer's lack of diligence and zealousness, I would be surprised if the state doesn't provide a malpractice action in those circumstances. Well, let me just I appreciate that, Judge. And we've certainly thought of it. But let me just I know we've spent a lot of time, but let me just finish that I will with. There was a lot of this evidence was before the district court on the initial summary judgment, the video, the deposition by Glidden, the video showing Robert Chambers, at least at that moment, not being hostile, not being aggressive, complying, being compliant, saying I'm on the ground, sir. And then we know that he then got up for whatever reason. It could be you here on the video. I'm going to tase you again. I think those last words are I'm going to tase you again. And I, you know, it's not unreasonable to assume that he was trying to get away from a guy who was out of control. If you listen to Officer Glidden's voice on the video, he's screaming at the top of his lungs. He's screaming at the top of his lungs. And he's and he's just tase him. He says he's going to tase him again. So I think there was enough evidence in this record for this court to find that summary judgment was appropriate just on the record alone. I think this court has an obligation under the federal rules and under its duty as a federal court to consider arguments about manifest injustice. And we do hope that the court will consider that. Thank you very much. Thank you, counsel. We appreciate the passion with which both of you all present the case. And we'll stand in recess until the next panel sits.